Filed 4/24/26  P. v. Waln CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B338799 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. XSEVA158343 |
| v. | |
| SCOTT WALN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Andrew C. Kim, Judge.  Affirmed.

Levine, Flier and Flier, Leonard B. Levine; Law Office of Kiana Sloan-Hillier and Kiana Sloan-Hillier for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted Scott Waln of committing a lewd act and a forcible lewd act on two of his former sixth-grade students. On appeal, Waln argues the trial court should have granted his motion for a new trial based on the erroneous exclusion of evidence, because he received ineffective assistance of counsel, and because of the cumulative effect of the errors. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The charges and trial*

In February 2023, the People filed an information charging Waln with five offenses against three of his former sixth-grade students, Briana A., Alexis L., and Mia G.[1] The People alleged Waln committed a lewd act on a child under age 14 against Briana (Pen. Code, § 288, subd. (a))[2], a forcible lewd act on a child under age 14 against Alexis (*id.*, subd. (b)(1)), and three lewd acts on a child under age 14 against Mia (*id.*, subd. (a)). The People alleged a special circumstance that Waln committed the offenses against multiple victims (§ 667.61, subds. (b), (e)(4)). They also alleged aggravating circumstances that the victims were particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)) and Waln used a position of trust (*id.*, rule 4.421(a)(11)).

### a. *The People's evidence*

The People tried the case to a jury in October and November 2023. We briefly summarize the evidence related to each victim. We discuss the evidence in more detail in other sections of this opinion.

---

[1] We refer to the named victims using their first names and last initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4), (10).)

[2] Undesignated statutory references are to the Penal Code.

### i.    Briana

Waln was Briana's sixth-grade math and computer teacher in 2017. Briana was failing both classes, and Waln had been pressuring her to improve her grades. One day, Briana went to Waln's classroom to talk to him about her poor performance on a recent test. Briana and Waln were alone in the classroom. Waln walked over to the door and shut it. Without saying a word, he walked over to Briana and grabbed her right breast with his right hand. Briana was scared and left the room.

Briana told her friend about the incident later that day. The friend asked Brent Parsonage—who was the school's physical education teacher—to talk to Briana. Briana told Parsonage Waln was "acting weird" and "touching her." Parsonage asked if Waln touched her "where her bathing suit covered." Briana said yes and pointed to her breast. She was crying.

After talking to Parsonage, Briana gave written statements about the incident to the school's principal and to law enforcement. The school removed Briana from Waln's classes, but Waln continued teaching at the school.

### ii.    Alexis

Waln was Alexis's sixth-grade science teacher in 2019. Shortly before winter break in December, Alexis asked Waln if there were ways she could improve her grade. Waln told Alexis to talk to him after class. Alexis stayed in the classroom after the class ended.

Once all the other students had left the classroom, Waln closed the door and locked it. Waln sat in a chair near where Alexis was seated. He told Alexis to unbutton his pants, which she did. According to Alexis, Waln was wearing black pants

3

with three buttons, and there was a zipper behind the buttons. Under his pants, Waln was wearing white and navy blue checkered boxers. Waln took his penis out of the slit in the boxers. Alexis had never seen a penis before.

Waln grabbed Alexis's wrist and put her hand on his penis. Alexis tried to move her hand away, but Waln forced her hand to move up and down on his penis. Waln was moaning and eventually ejaculated. The ejaculate landed on Waln's pants and Alexis's hand. Waln moved closer to Alexis and put his hand down her pants on top of her underwear. He moved his hand from side to side on her genitals.

Waln told Alexis not to tell anyone what happened, and he threatened to give her a failing grade. Waln told Alexis no one would believe her and people would think she is crazy. He directed Alexis to wash her hands in the classroom sink.

Alexis washed her hands and left the classroom. She returned to Waln's classroom after lunch to get her backpack. She noticed Waln had changed his pants and shirt.

Alexis did not initially tell anyone about the incident because she was ashamed, scared, and thought no one would believe her. However, she wrote about the incident in her journal.[3]

About two years after the incident, Alexis created a TikTok video consisting of a collage of photographs of herself

---

[3] Alexis and her mother searched for the journal but could not find it. They thought it might have been lost when they moved to another house.

at different ages.[4]  The audio—which Alexis took from another TikTok user's video—was a conversation between two people. One person says, "What that man did to you in the bus has nothing to do with your smile or your personality and it is absolutely not your fault."  Alexis did not post the TikTok video on the internet or send it to anyone.

In May 2022, Alexis's mother discovered the video on Alexis's phone.  Alexis's mother was alarmed and asked Alexis "where the video came from, the music, the lyrics."  Alexis said she "got those lyrics from a song."  Alexis's mother asked if something bad happened.  Alexis nodded her head affirmatively, wrote " 'Scott Waln' " on a coloring book, and eventually told her mother what happened.  Alexis's mother filed a police report the next day.

### iii.     Mia

Waln was Mia's sixth-grade teacher for two classes in 2021. Waln made Mia feel uncomfortable in class by commenting on the way she sat and asking her why she did not smile at him. One time, Mia caught Waln looking at her breasts.  Another time, Waln reached over Mia's shoulder to grab a piece of paper off her desk, and his hand made contact with her breasts.  A different day, Mia bent over at the waist to pick up books off the floor in Waln's classroom.  Waln walked behind her and bumped into her buttocks twice.  Mia could feel Waln's penis against her buttocks.  The last incident occurred while Mia was standing

---

[4]     Alexis described TikTok as a smartphone application "where people can post short videos that they make" using other people's material.

in line outside Waln's classroom. Waln walked past Mia and quickly grabbed her buttock.

Mia told her mother about the incidents. Mia's mother did not immediately report Waln because she was not certain he acted inappropriately. However, she contacted the police after learning Waln had been arrested in connection with Alexis's allegation.

b.    *The defense*

Waln called seven witness in his defense, most of whom testified to issues related to the incident with Alexis. We discuss the defense evidence in more detail in other sections of this opinion.

c.    *The verdict*

The jury found Waln guilty of the offenses against Briana and Alexis. It found true the aggravating circumstances and the multiple victim special circumstance. The jury found Waln not guilty of all three offenses against Mia.

## 2.    *Waln's motion for a new trial*

After the jury returned its verdicts, Waln filed a motion for a new trial and a supplement to the motion. Waln argued he was entitled to a new trial based on errors by the trial court and defense counsel. Specifically, Waln argued the trial court erroneously excluded evidence of Alexis's school records and precluded him from playing for the jury the original source of the audio Alexis used in her TikTok video. Waln argued defense counsel—who drafted the motion for a new trial[5]—erroneously advised him not to testify, failed to call character witnesses, and failed to present evidence that he chaperoned overnight student

---

[5]    Waln expressly waived his right to conflict-free counsel.

6

field trips without incident. Waln also argued defense counsel should have obtained and presented more evidence showing there was no sink in his classroom, Alexis's description of his penis was physically impossible, and a sheriff's deputy claimed to have made a mistake in a report that benefited the prosecution.

The trial court held a hearing to consider the motion, and then issued a written order denying the motion. The court concluded Waln received a fair trial and failed to show any error, let alone prejudicial error.

### 3. *The sentencing*

Briana, Alexis, and Alexis's parents gave victim impact statements at the sentencing hearing. The court sentenced Waln to two consecutive terms of 15 years to life. The court stated each victim "is deserving of a separate and consecutive sentence."

Waln timely appealed the judgment.[6]

## DISCUSSION

### 1. *The trial court properly denied the motion for a new trial based on the exclusion of evidence*

Waln argues the trial court abused its discretion by denying his motion for a new trial on the grounds that the court

---

[6] Waln separately appealed the trial court's order denying his motion for bail pending appeal. At Waln's request, we consolidated the two appeals. While the consolidated appeal was pending, Waln filed a motion in this court seeking bail pending appeal. We denied Waln's motion without prejudice in March 2025, explaining, "Waln has not demonstrated that the trial court abused its discretion, unjustifiably denied his motion for bail, or shown by clear and convincing evidence that he must be granted bail on appeal." Waln does not address the bail issue in his opening brief on appeal, which he filed in May 2025. Therefore, we do not discuss it.

improperly excluded relevant evidence.  Waln contends the trial court should have allowed him to question witnesses about information contained in Alexis's school records.  He also contends the court should have allowed him to play for the jury video of two scenes from a television show that was the original source of the audio in Alexis's TikTok video.

a. *Standard of review*

"Except as otherwise provided by statute, no evidence is admissible except relevant evidence.  (Evid. Code, § 350.)  Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact . . . .'  (*Id*., § 210.)  The trial court is vested with wide discretion in determining the relevance of evidence.  [Citation.]  The court, however, has no discretion to admit irrelevant evidence.  [Citation.]  'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' "  (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.)

We review a trial court's exclusion of evidence—including for lack of relevance—for an abuse of discretion.  (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766.)  We may not disturb a trial court's ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 (*Rodriguez*).)

" 'A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion.  " 'The determination of a motion for a

new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 729–730.)

  b.  *Alexis's school records*

    i.  Background

Before trial, the prosecutor moved to exclude a document from Alexis's school records, which the parties refer to as the "school logs." The document consists of 12 log entries, the substance of which we discuss below. The trial court ruled defense counsel could not "unilateral[ly]" introduce the school logs into evidence, but he could use them for impeachment or rebuttal if relevant. Defense counsel agreed with the court's ruling.

During trial, Alexis's mother testified that she noticed changes in Alexis's behavior in late February and early March 2020, before the school shut down for the pandemic. The prosecutor asked if the "changes were due to the fact that Mr. Waln had touched [Alexis] inappropriately." The court sustained defense counsel's objection.

On cross-examination, the prosecutor objected when defense counsel asked Alexis's mother, "[W]ere you aware of . . . contact that [Alexis] had had in school with the counselor's office, and other issues that were going on during that time period?" During a sidebar, the prosecutor noted defense counsel's question implicated information contained in the school logs. Defense counsel argued the logs impeached testimony that Alexis's behavior changed a few months after the incident with Waln. Counsel asserted the logs also were relevant to show Alexis

9

had opportunities during "interventions" at school to disclose Waln's abuse, but she failed to do so.

The court sustained the prosecutor's objection. The court noted Alexis's mother testified the behavioral changes occurred in February or March 2020, yet many of the incidents counsel wanted to question her about took place much later. The court also stated Alexis's mother was not the proper witness to testify about opportunities to disclose the abuse to counselors or therapists. The court agreed to revisit the issue during Alexis's testimony. After the sidebar, defense counsel did not ask Alexis's mother any questions about the school logs.

Defense counsel raised the issue again while cross-examining Alexis. Counsel asked the court to allow him to question Alexis about entries suggesting she had talked to school counselors or that counselors were available to her. Counsel argued "the jury has the right to know that . . . [Alexis] had her own issues that she went to counselors about, unrelated to this case, and that counselors were available there for her to see and talk to if she had any complaints against Mr. Waln."

The court ruled defense counsel could not question Alexis about interactions with counselors "unless you can represent to me that something in those logs indicated that she was given the opportunity, or was asked, or there was some questioning regarding the subject matter of inappropriateness by staff, teachers, or by Mr. Waln, specifically." Defense counsel did not make an offer of proof and did not question Alexis about the school logs.

In his motion for a new trial, Waln argued the trial court should have allowed him to question witnesses about the school logs. According to defense counsel, the logs were relevant to

10

explain Alexis's mother's testimony regarding Alexis's change in behavior.[7]  Counsel argued the logs also help to explain why Alexis disclosed Waln's abuse years after the incident.

The trial court discussed the relevant log entries in detail in its order denying the motion for a new trial.  The court concluded it properly excluded the school logs from evidence.

      ii.     Analysis

On appeal, Waln argues the trial court should have allowed him to question witnesses about log entries on four topics:  (1) Alexis's access to counseling services; (2) Alexis's accusation that another student slapped and hugged her without consent; (3) Alexis's violation of the school's phone policy; and (4) Alexis's participation in a video production class.[8]  Waln contends the entries on these topics were relevant for a variety of purposes, including to impeach Alexis's preliminary hearing testimony, explain her behavioral changes, show a motive to

---

[7]     Counsel argued specifically that the court should have allowed him to question witnesses about a log entry from January 2020 stating Alexis " 'wrote an inappropriate story on GoogleDocs.' "  Waln does not meaningfully address that entry on appeal, so we do not discuss it.

[8]     To the extent Waln argues the court should have allowed him to question witnesses about entries concerning other topics, he forfeited the arguments by failing to support them with meaningful analysis.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [appellate courts need not consider general assertions in briefs unsupported by specific argument and citation to relevant authorities]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' "].)

fabricate allegations, rebut the prosecution's timeline, and contextualize the TikTok video.[9]

*Counseling services.* Waln argues the trial court should have allowed him to question witnesses about log entries that showed Alexis received, or had access to, counseling services. There are three log entries that address the issue. A September 16, 2020 entry states, "Called home and talked to dad first then to Alexis. She said she had talked to her parents about her feelings of not belonging or of taking her life. She had no plans but just had some feelings about it. I talked to dad again and asked if we could provide counseling, he will come on Monday to fill out paperwork (counseling through NLMUSD)." A September 18, 2020 entry states, "referred to school counselor." A December 10, 2021 entry states, "Student was given counseling and check-ins will be provided."

Waln contends the entries are relevant because they contradict Alexis's testimony at the preliminary hearing. Specifically, he points to Alexis's testimony that she did not tell anyone about Waln's abuse for "about three" years. Defense counsel asked, "[D]uring that whole time, did you ever speak

---

[9] As Waln seems to acknowledge, he did not make most of these arguments in the trial court, which forfeits the issues on appeal. (See Evid. Code, § 354; *People v. Ramos* (1997) 15 Cal.4th 1133, 1178 [defendant's failure to make offer of proof in the trial court forfeited argument on appeal that the court improperly excluded evidence].) Nevertheless, we will consider the arguments on the merits given Waln's contention—albeit cursory—that defense counsel's failure to make the arguments below constitutes ineffective assistance of counsel.

to school counselors or therapists or anyone about other things?" Alexis responded, "No."

Contrary to Waln's contentions, the log entries were not admissible solely to impeach Alexis's preliminary hearing testimony. Alexis's preliminary hearing testimony was not in evidence at trial, and neither party sought to admit it. Nor did Waln have the right to question Alexis on collateral matters solely for the purpose of eliciting testimony to be contradicted. (See *People v. Contreras* (2013) 58 Cal.4th 123, 154.)

There is no merit to Waln's suggestion that the court should have allowed him to use the entries to impeach testimony concerning Alexis's behavioral changes. As the trial court repeatedly explained, Alexis's mother testified that Alexis's behavior changed in February and March 2020. The counseling log entries concerned incidents that took place in September 2020 and December 2021. Those entries do not impeach testimony about behavioral changes in early 2020.

We also disagree with Waln to the extent he argues the entries were relevant to show Alexis had opportunities to disclose the abuse earlier. Alexis never claimed she failed to disclose the abuse for lack of opportunity. Instead, she testified she was ashamed and scared, and thought no one would believe her. The fact that Alexis was in counseling for other issues does not contradict that testimony.

Waln argues the trial court's ruling was arbitrary because the court did not restrict him from asking Mia about her counseling sessions. We disagree. Mia's counseling sessions took place around the time of the alleged incidents and resulted in the school transferring her out of Waln's class. In contrast, there is nothing even to suggest Alexis's sessions concerned Waln

13

in any way.  Given that distinction, the court's ruling was not "arbitrary, capricious, or patently absurd." (*Rodriguez, supra,* 20 Cal.4th at pp. 9–10.)  Accordingly, Waln has not shown the trial court erred on this ground.

*Incident with another student.*  Waln argues the trial court should have allowed him to question witnesses about log entries from December 2021 concerning an incident between Alexis and another student.  According to the entries, Alexis reported that another student slapped her in the face and hugged her "unwantedly and made her uncomfortable."  Alexis's mother reportedly told the school "her daughter is afraid of the student and it has caused her to become ill and to have anxiety."  Another entry states, "not able to find witnesses.  Action:  Student was given counseling and check-ins will be provided."

Waln argues these entries were relevant to show Alexis had a "pattern of untruthfulness" in the month of December and "lent credence to the defense argument that Alexis had a propensity to fabricate accusations."  We disagree.  The entries do not state, or even suggest, that Alexis fabricated the accusation against the other student.  No reasonable juror could have reached that conclusion had the court allowed Waln to question witnesses about the log entries.

Nor is there merit to Waln's suggestion that these entries would have rebutted an inference that his abuse caused Alexis's behavioral changes.  As we noted above, Alexis's mother testified that the behavioral changes occurred in early 2020.  The incident with the other student occurred in 2021.  Thus, the incident with the student could not have caused the behavioral changes.

Waln suggests the entries were relevant because of their proximity to Alexis's creation of the TikTok video.  As best we

14

can tell, Waln's contention is the jury could have found Alexis created the TikTok video in response to the incident with the student but concealed that fact by fabricating allegations against Waln. His argument lacks merit. According to the log entries, the assistant principal met with Alexis and her mother to discuss the incident with the student around the time it occurred. It is not clear, then, what motive Alexis would have had to hide from her mother a connection between the incident and the TikTok video. Waln suggests none. On this record, no reasonable juror could have accepted Waln's theory. Accordingly, he has not shown the trial court erred on this ground.

*Phone use during school.* Waln argues the trial court should have allowed him to question witnesses about three log entries concerning Alexis's use of a phone during school. An August 2021 entry states, "student using phone during school hours. First offense, warning." A September 2021 entry states, "Student was using the phone during school hours. 2nd offense. Parent Pick up." An October 2021 entry—entitled "Cell phone"—states, "2nd offense, parent pick up."

Waln argues the trial court should have allowed him to ask Alexis's mother whether the phone violations involved Alexis accessing TikTok during school. He also suggests it is possible Alexis was watching explicit sexual content on her phone. No reasonable juror could have reached either conclusion based on the log entries, which state only that Alexis was using a phone during school hours. Waln's assertions otherwise are pure speculation. He has not shown the trial court erred on this ground.

*Video production class.* Waln argues the trial court should have allowed him to question witnesses about two log entries

15

referring to a video production class. An August 19, 2020 entry states, "Mom called and said Alexis did not want Video Production Class." An entry from the next day states, "[L]eft a message for mom this morning regarding her concern over Alexis being in the video production class."

According to Waln, these entries are relevant because—when considered with evidence that Alexis did not immediately tell her mother about the source of the audio she used in her TikTok video—they suggest Alexis "may not have been allowed to make or view TikTok videos." Once again, Waln's argument relies on baseless speculation. No reasonable juror could have reached that conclusion based on the log entries, even when considered with all the other evidence presented at trial. In any event, Waln fails to explain why it would have been relevant that Alexis was not allowed to make or view TikTok videos. Accordingly, he has not shown the court erred on this ground.

c. *The* Sex Education *video clips*

i. Background

The original source of the audio in Alexis's TikTok video is a "British teen sex comedy-drama" television show called *Sex Education*. The audio came from a scene in which a therapist and a young woman discuss a sexual assault. The show depicted the sexual assault in a separate scene. According to the trial court, that scene showed a "young woman riding a crowded bus being ejaculated on by a male passenger." In the therapy scene, the therapist says, " 'What that man did to you on the bus is not your fault and has nothing to do with your smile or your

16

personality and it's only about him and it is absolutely not your fault.' "[10]

Before trial, the People asked the court to order the defense not to mention the name *Sex Education* in front of the jury. The prosecutor argued it would be prejudicial to mention the name because the jury might believe Alexis watched a show related to the allegations. Defense counsel said he planned to ask Alexis general questions about the source of her TikTok video without "going into *Sex Education* or anything." Counsel said he "would only ask to show her the actual video from the *Sex Education* show if she denies this had anything to do with another video or anything and that she just made this up herself, but I would seek permission of the court first." The court agreed with defense counsel's approach. The court noted that, if other issues with the video were to arise at trial, it would hold a hearing to resolve them if necessary.

During trial, the prosecutor asked Alexis to describe her process of creating the TikTok video. Alexis said she "was on TikTok, and [she] heard that sound from another video that someone had posted." The other video had photographs, but Alexis could not remember what they were. Alexis "listened to the lyrics" and decided to make her own video using the same audio. Alexis included subtitles on her video, in which she changed the word "bus" to "room."

On cross-examination, Alexis denied seeing "that video that had the word 'bus' on it." She also denied seeing "any video at all

_____

[10] Alexis used an edited version of the audio from this scene in her TikTok video. In Alexis's video, the person says: "What that man did to you in the bus has nothing to do with your smile or your personality and it is absolutely not your fault."

17

showing someone ejaculating on a bus onto a person." Defense counsel asked Alexis if she took the audio "from another video, and just changed it by changing some of the words, and putting your photos on it, as opposed to the photos that were on the video you saw on TikTok." Alexis replied yes and said she did not know "where that [other] video came from." Counsel did not mention *Sex Education* or attempt to play for the jury any scenes from the show.

In his motion for a new trial, Waln argued for the first time that the court should have allowed him to play for the jury video clips from *Sex Education*. Waln argued two scenes from the show were relevant: (1) the therapy scene that was the original source of the audio in Alexis's TikTok video; and (2) the scene depicting the sexual assault on the bus. According to defense counsel, he realized only after the trial that "Alexis likely fabricated her allegations against Waln after viewing" clips from the show. Counsel asserted he did not explore the issue earlier given the court's pretrial ruling "disallowing such questioning unless Alexis first admitted to having viewed" *Sex Education*.

The trial court concluded neither scene was admissible. The court explained the videos were irrelevant because Alexis testified she never saw the bus scene in *Sex Education*, and her allegations against Waln were not sufficiently similar to the sexual assault depicted in the show. The court noted the sexual assault in the show occurred in public, the victim disclosed the assault to a therapist, the perpetrator was a stranger to the victim, and the perpetrator's penis was never shown.

ii.    Analysis

On appeal, Waln argues the trial court abused its discretion to the extent it determined video clips from *Sex*

18

*Education* are irrelevant. He contends the court's ruling "denied the defense the opportunity to substantiate their argument that these videos were a source of inspiration for Alexis'[s] own video."

At the outset, Waln forfeited these arguments by failing to make them during trial. Waln did not seek to play the videos for the jury. Instead, he raised the issue for the first time in his motion for a new trial, which was untimely. (See Evid. Code, § 354; *People v. Lucas* (1995) 12 Cal.4th 415, 462 [defendant forfeited evidentiary issue raised for the first time in a motion for a new trial].)

Even if we were to overlook the forfeiture, we would reject Waln's argument on the merits. Although it is undisputed that Alexis used audio from the show *Sex Education* in her TikTok video, she testified she had not seen the video that was the original source of the audio. Alexis testified she got the audio from another TikTok user's video and did not know the source of the audio in that video. Waln points to nothing in the record even to suggest otherwise. Nor does Waln challenge the trial court's observation that the "only similarity between the [bus] video . . . and Alexis'[s] sexual assault was that they both involve an act of masturbation; in just about every other way, the two are different." Given the lack of similarities, no reasonable juror could have inferred Alexis "derived her knowledge from the *Sex Education* videos," as Waln contends. The trial court did not abuse its discretion when it denied the motion for a new trial on this ground.

2. ***The trial court properly denied the motion for a new trial based on ineffective assistance of counsel***

Waln argues the trial court should have granted his motion for a new trial because he received ineffective assistance of

19

counsel in violation of the Sixth Amendment to the United States Constitution.[11]  According to Waln, his counsel's performance was constitutionally deficient in three respects:  (1) counsel failed to present evidence that a sheriff's deputy admitted making a mistake in a report; (2) counsel failed to present evidence definitively proving he is circumcised; and (3) counsel failed to present evidence proving there was no working sink in Waln's classroom.  We address each issue in turn.

      a.    *Standard of Review*

While ineffective assistance is usually most appropriately decided in a habeas corpus proceeding, a defendant may raise the issue as a ground for a new trial.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*).)  If the court can determine the effectiveness issue on a new trial motion, it should rule to expedite justice.  (*Ibid*.)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'  [Citation.]  To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical

---

[11]    In passing, Waln asserts defense counsel's performance also violated his "right to a fair trial, . . . to a reliable verdict and to due process and fundamental fairness under the California Constitution and the Sixth and Fourteenth Amendments to the United States Constitution."

20

purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*Hoyt, supra*, 8 Cal.5th at p. 958; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

The United States Supreme Court has cautioned that, "[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (*Harrington v. Richter* (2011) 562 U.S. 86, 109–110.)

      b.    *Impeachment of Deputy Meredith*

          i.    Background

A contested issue at trial was the accuracy of Alexis's description of Waln's penis during her interviews with law enforcement.  Deputy Jacob Meredith—who was a patrol deputy at the Norwalk sheriff's station—conducted the first law enforcement interview of Alexis concerning the incident with Waln.  In a report summarizing the interview, Deputy Meredith wrote Alexis described Waln's penis as follows:  "seven inches, uncircumcised, dirty blonde pubic hair and the head of his penis was pink."

Detective Larry Flores—who was the lead investigator on the case—interviewed Alexis sometime after Deputy Meredith. According to Detective Flores's report of that interview, Alexis said "there was skin covering [Waln's penis], but when she had

21

her hand on it and moved her hand down (or towards his body) the excess skin would move down as well exposing the tip of his penis. When her hand moved in an upward movement, the excess skin would cover the tip of his penis."

Asked to describe Waln's penis at the preliminary hearing, Alexis said "it had like a—like, I don't know the word—a hood or something? Like, he was putting a hand up, just like something covered the tip and it went down again." On cross-examination, she agreed that "when your hand moved in an upward movement, the excess skin would cover the tip of his penis." Alexis said she did not know the difference between a circumcised and uncircumcised penis.

At the preliminary hearing, Detective Flores testified he viewed photographs of Waln's penis taken while Waln was in custody.[12] Defense counsel asked Detective Flores, "And in fact it was revealed that Mr. Waln has a circumcised penis, is that correct?" Detective Flores responded, "That's correct."

Seven months later—while jury selection for the trial was in progress—Detective Flores told the prosecutor he misspoke at the preliminary hearing. He said, after viewing the photographs of Waln's penis, he believed Waln is uncircumcised. The prosecutor informed defense counsel. At the parties' request, the trial court declared a mistrial to give the defense time to get an expert opinion on whether Waln is circumcised.

A day or two before the start of the second trial, defense counsel and the prosecutor met with Deputy Meredith to discuss

---

[12] Detective Flores obtained a search warrant to take photographs of Waln's penis. Detective Flores was not personally present when the photographs were taken.

22

his initial interview with Alexis. For the first time, Deputy Meredith said Alexis described a circumcised penis during the interview. He recalled her saying, "when she moved her hand up and down, the skin did not cover the tip of the penis." Deputy Meredith said he made a mistake in his report when he wrote that Alexis described an uncircumcised penis.

At trial, Alexis clarified the testimony she gave at the preliminary hearing about Waln's penis. According to Alexis, when she said Waln's penis had a "hood," she was referring to "the tip of it," which was pink. Alexis said skin would "go up" while she was stroking Waln's penis, but it would not "cover" the tip. The tip was always visible.

The defense presented expert testimony from a urologist who examined Waln and concluded he is circumcised. Defense counsel also called Detective Flores and Deputy Meredith as defense witnesses. Counsel questioned Detective Flores extensively about his preliminary hearing testimony and whether he believed, based on the photographs of Waln's penis, that Waln is uncircumcised. Counsel questioned Deputy Meredith about his initial interview of Alexis. However, counsel did not ask Deputy Meredith about the "mistake" in his report or whether Alexis described Waln's penis as uncircumcised.

In the motion for a new trial, Waln argued defense counsel committed error by not presenting to the jury evidence of Deputy Meredith's mistake. According to Waln, the evidence "would have left the jury with two choices; either that [Deputy] Meredith had intentionally changed his description of the evidence to support the prosecution's case, or it was just another incredibly coincidental mistake by law enforcement as to the crucial issue of the description by Alexis of her attacker's penis."

The court determined defense counsel's failure to question Deputy Meredith on the circumcision issue was not "ineffective, or a mistake, or a failure," and "would not have affected the result in this case." The court explained defense counsel achieved the "ultimate objective" to impeach Alexis on her description of Waln's penis. The court noted the value of questioning Deputy Meredith on the point was "negligible when compared to the . . . greater effect of directly impeaching Alexis and her description of Defendant's penis." The court also noted defense counsel "conclusively proved"—through photographs and expert testimony—that Waln's penis is circumcised.[13]

ii.     Analysis

On appeal, Waln argues defense counsel's failure to present evidence of Deputy Meredith's mistake constituted ineffective assistance of counsel. We disagree.

There are obvious tactical reasons why counsel might have avoided questioning Deputy Meredith about his mistake. Deputy Meredith wrote in his report that Alexis described Waln's penis as uncircumcised. That fact was helpful to the defense, as it contradicted the undisputed evidence that Waln's penis is circumcised. If the jury learned Deputy Meredith claimed he meant to write "circumcised," there was a risk the jury would

---

[13]     The trial court later acknowledged that, at the time it ruled on the motion for a new trial, it erroneously believed evidence of Deputy Meredith's mistake was before the jury. The court thought Waln was arguing defense counsel was ineffective for failing to question Deputy Meredith about that evidence, not that he was ineffective for failing to introduce the evidence in the first place. The court stated its position did not change knowing evidence of Deputy Meredith's mistake was not before the jury.

24

question whether Alexis had, in fact, described a circumcised penis during the initial interview. If so, it would have undercut one of the defense's strongest arguments: that Alexis repeatedly gave inaccurate descriptions of Waln's penis. Counsel had to weigh that possibility against the benefit of impeaching Deputy Meredith. A reasonable attorney could have concluded the benefit of questioning Deputy Meredith was not worth the risk of undercutting one of the defense's strongest attacks on Alexis's credibility. Indeed, we suspect the majority of experienced trial attorneys would have made that choice.

Waln argues any tactical justifications for defense counsel's actions are irrelevant because counsel admitted he did not make a strategic decision.[14] Defense counsel submitted two declarations under penalty of perjury in connection with the motion for a new trial. Counsel did not address his failure to question Deputy Meredith in either. Nevertheless, Waln points to a sentence in a trial brief—which defense counsel drafted—stating it "is not true" that counsel failed to question Deputy Meredith for strategic reasons.[15] Counsel also suggested during

---

[14] Although the *Strickland* standard is objective, the California Supreme Court has stated a defendant can "reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, his action—no matter how unobjectionable in the abstract—is professionally deficient." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

[15] In the motion for a new trial, defense counsel wrote the decision not to question Deputy Meredith was error, but he did not deny having a strategic reason for making the choice. In opposition to the motion, the People argued counsel made

---

the hearing on the motion for a new trial that he did not question Deputy Meredith because "it was so late in the proceedings" and he "was so focused on the other points."

Defense counsel's assertion that he was not acting strategically strains credulity. The fact that Alexis described Waln's penis as uncircumcised was central to Waln's defense. During his closing argument, defense counsel asserted the circumcision issue "dwarfs all the others" in the case. Counsel argued the "fact that [Alexis] says [Waln] was uncircumcised . . . [b]ut . . . he is circumcised proves his innocence." Counsel also asserted the "assailant had an uncircumcised penis and [Waln] does not. End of story." Given the centrality of this issue to the defense, we highly doubt counsel would have risked planting any seeds of doubt in jurors' minds on whether Alexis described Waln's penis as circumcised.

The manner in which defense counsel presented evidence of Deputy Meredith's report supports that conclusion. It is clear from the trial record that counsel wanted the jury to know Deputy Meredith wrote in his report that Alexis described an uncircumcised penis. Indeed, counsel mentioned that fact three times in his opening statement. However, counsel did not present that evidence to the jury through Deputy Meredith, which would have opened the door to testimony that he made a mistake in his report. Instead, defense counsel presented the

---

a "calculated decision . . . to avoid having yet another witness, another adult, admit to having used the word circumcised and uncircumcised incorrectly." In a motion to supplement the motion for a new trial, counsel refuted that argument, writing, "It would be easy for counsel to attribute the decision not to question Meredith as defense strategy, but that is not true."

26

evidence while questioning Detective Flores. Defense counsel later called Deputy Meredith to testify as a defense witness and questioned him extensively about Alexis's interview, including her description of the length of Waln's penis and the fact that it was erect. However, counsel did not ask Deputy Meredith whether Alexis described Waln's penis as uncircumcised. These actions suggest defense counsel purposefully avoided the issue of Deputy Meredith's "mistake," likely for the strategic reasons we discussed above.

Even if we were to take defense counsel at his word, Waln has not shown prejudice. Waln argues questioning Deputy Meredith would have "effectively challenged the credibility of the prosecution's case" by suggesting law enforcement was willing to fabricate evidence to benefit the prosecution. While that may be true, defense counsel introduced other compelling evidence on the issue. Specifically, counsel presented evidence that Detective Flores—who was the investigating officer in charge of the entire case—claimed to have given inaccurate testimony while describing Waln's penis at the preliminary hearing. There was marginal benefit to showing Deputy Meredith—who was a patrol officer with little involvement in the case—made a similar mistake in his report. That is especially true given the case did not turn on whether the jury believed law enforcement fabricated evidence. Rather, it turned on whether the jury believed Alexis's testimony that Waln sexually assaulted her. On that issue, questioning Deputy Meredith about a mistake in his report could only hurt the defense's case.

On this record, Waln has not shown a reasonable probability that, but for counsel's error, the result in the proceeding would have been different. Nor does the error

27

otherwise undermine our confidence in the outcome of the trial. Accordingly, Waln has not shown he received ineffective assistance of counsel. (See *Hoyt, supra*, 8 Cal.5th at p. 958 [an ineffective assistance of counsel claim requires the defendant to show resulting prejudice].) The trial court did not abuse its discretion when it denied the motion for a new trial on this ground.

c. *Circumcision evidence*

i. Background

During her interviews with law enforcement, Alexis described Waln's penis in a way that suggested it is uncircumcised. To impeach Alexis on that issue, Waln presented expert testimony from a urologist, Dr. Justin Houman. Dr. Houman examined Waln's flaccid penis and concluded it is circumcised.

The prosecutor did not deny that Waln's penis is circumcised. However, in her closing argument, the prosecutor pointed to photographs of Waln's flaccid penis that showed some "wrinkled skin" and asked, "[I]s it unreasonable to believe that what we see in the pictures . . . is exactly what Alexis saw? That wrinkled skin on the penis, that wrinkled skin on the testicles, and when that skin is pushed up, it actually, in fact, covers the ridge of it[?]"

In his motion for a new trial, Waln argued defense counsel should have presented "more precise evidence" concerning "the state of [his] penis vis-a-vis circumcision, and whether or not, during masturbation in its erect state, skin would cover the head during upward movement, and then expose it during downward movement." In support, Waln submitted a sworn declaration from his expert, Dr. Houman. Dr. Houman stated he examined

28

Waln a second time after trial "with the goal of discovering more definitive evidence . . . regarding the issue of whether or not the defendant was circumcised." Based on the second examination—this time in a partially erect state—Dr. Houman again concluded Waln "is clearly circumcised." Dr. Houman also concluded the "physical state of [Waln's] penis in the partially erect state does not contain sufficient skin to cover the head as Alexis described; or even close to that state. Even with a partial erection, there is no skin that gets remotely close to the head of the penis to give the impression of an uncircumcised penis."

Waln also submitted a declaration from defense counsel stating he should have originally instructed Dr. Houman to examine Waln in an erect state. Counsel asserted the evidence was necessary to rebut the prosecutor's argument that, although Waln is circumcised, he has some excess skin on his penis that could account for Alexis's description of "skin moving up and down." Counsel asserted he should have asked Dr. Houman two questions: (1) is Waln circumcised; and (2) "[b]ecause of [Waln's] circumcision, would it be possible for the skin on his penis to cover the entire head, in an erect state?"

The court did not address this issue in its written order denying the motion for a new trial. However, at the hearing on the motion, the court stated it read Dr. Houman's declaration and concluded it did not provide grounds for a new trial.

   ii. Analysis

On appeal, Waln argues his counsel was ineffective for failing to elicit testimony from Dr. Houman to eliminate "any doubt about whether skin would cover or expose the head of [Waln's] erect penis during masturbation." The record, however, shows counsel did elicit testimony on that issue at trial. Defense

29

counsel asked Dr. Houman, "In the case of an uncircumcised penis, if the evidence was that the hand was moving up, and skin, as it moved up, covered the tip, and as the hand went down, the skin went down and the tip was uncovered, would that be a circumcised or uncircumcised penis?"  Dr. Houman answered, "If it covered the head—the only way it would—an uncircumcised penis would fully cover the head.  It's always fully covered."  Defense counsel asked, "And a circumcised penis would not?"  The doctor replied, "It would not."  Counsel asked if during masturbation "the skin would cover the entire hood of the penis . . . [w]ould that be a circumcised penis or an uncircumcised [penis], in your opinion?"  Dr. Houman replied, "That would be an uncircumcised penis."

Considering this testimony with Dr. Houman's opinion that Waln is circumcised, the jury would have understood that the skin on Waln's penis could not cover the entire head during masturbation.  Dr. Houman's examination after trial simply confirmed that fact.  As such, it was cumulative and would not have meaningfully affected the outcome of the case.  Accordingly, Waln has not shown the trial court erred when it rejected his ineffective assistance of counsel claim on this ground.  (See *People v. Padilla* (1995) 11 Cal.4th 891, 960–961, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800 [defense counsel was not ineffective for failing to seek a new trial based on newly discovered evidence that was cumulative].)

    d.    *Classroom sink*

        i.    Background

A contested issue at trial was whether there was a portable sink in Waln's classroom in 2019.  The issue was relevant to Alexis's testimony that she washed her hands in a

sink at Waln's direction after he ejaculated on her. She said the sink was two feet wide, had handles, and could be moved around.

The People presented testimony from Detective Flores that he visited the school during his investigation and found six portable sinks. The sinks were not in Waln's former classroom. The court admitted a photograph of one of the sinks over defense counsel's objection. The court ruled the photograph was relevant for the purpose of showing that portable sinks exist, a fact that might not be common knowledge.

The People called Gerald Mitchell—who was the director of maintenance and operations at the school—to testify on a different issue. However, defense counsel asked Mitchell about the sink issue during cross-examination. In response to counsel's questions, Mitchell testified he ordered portable handwashing stations for the school in 2021 in response to the pandemic. Mitchell had no knowledge of a sink ever being inside Waln's former classroom. On redirect, Mitchell testified that he visited Waln's former classroom in April 2023 and found "some type of water dispenser . . . that said something to the effect of . . . lab use H2O." It could be used to fill "a cup, or a pail, or something like that." Mitchell did not know whether the water dispenser was in Waln's classroom in 2019.

The defense called two witnesses to testify on the sink issue. Steve Fericean—who was the school district's director for purchasing and warehouse—searched the district's records for "evidence of any portable handwashing stations, or temporary sinks, or sinks that were ever placed in any classrooms." Fericean found purchase orders for portable sinks, but the orders were placed after the start of the pandemic in 2020.

The defense also called Paula Mayes, who was an assistant principal at the school from 2014 through 2021. Mayes visited Waln's classroom every other week to observe him teaching. According to Mayes, there was never a sink in his classroom. Mayes said she was aware of a sink in a different classroom, but it was not functional.

During her closing argument, the prosecutor acknowledged she did not have a picture of a sink in Waln's classroom, noting the "evidence is what it is." The prosecutor suggested the jury should follow the instruction to " 'not automatically reject the testimony just because of inconsistencies or conflicts,' " especially when considering "the testimony of young ladies who are remembering events that happened to them when they were 11 and 12 years old in sixth grade." The prosecutor said people "sometimes honestly forget things or make mistakes; it does not mean that they are lying."

The prosecutor also noted Mitchell's testimony about the "lab use H2O" dispenser. The prosecutor did not argue the dispenser was in Waln's classroom. However, she stated, "Obviously the teacher that had that classroom in April 2023, when Mr. Mitchell went there, was resourceful enough to find some way to dispense water, right, for the lab use. So is it unreasonable to think that teachers can bring their own materials?"

In connection with Waln's motion for a new trial, defense counsel asserted he discovered new evidence proving there was no working sink in Waln's classroom. Counsel attached to the motion an affidavit from Mark Jackson, who was the school's head custodian. According to the affidavit, the school purchased portable sinks "long before the Covid break," but they "were

32

never operational" or filled with water. Jackson asserted there was "no water source for the sinks other than the tank at the bottom of the sink. Those tanks were never filled. In no way were those sinks operational. There was never any water in any of them."

The court concluded counsel did not commit error in failing to call Jackson or submit other evidence on the sink issue. The court determined Jackson's affidavit was "cumulative rather than new." The court noted defense counsel presented other evidence at trial that "more than adequately addressed the lack of a working sink in [Waln's] classroom and achieved the objective of impeaching Alexis'[s] testimony" on the issue.

ii.    Analysis

On appeal, Waln contends defense counsel was ineffective for realizing "[o]nly after the verdict . . . the necessity of establishing the exact time period when a sink . . . was on the school campus, including the relevant period between August and December 2019." This contention borders on the frivolous. The record shows defense counsel conducted a thorough investigation of the sink issue. To prepare for trial, defense counsel interviewed and served subpoenas on three witnesses who could testify for the defense on the sink issue. At trial, counsel elicited helpful testimony while cross-examining Mitchell, and called two witnesses to testify on the issue for the defense. Mayes provided compelling direct evidence that there was no sink —working or otherwise—in Waln's classroom at the relevant times. Fericean supported her testimony by suggesting the school did not order portable sinks until 2020. This evidence effectively impeached Alexis's testimony that there was a portable sink in the classroom in 2019. Indeed, as Waln

33

concedes on appeal, defense counsel "present[ed] compelling evidence at trial that no such sink existed." On this record, Waln's contention that his counsel did not realize the importance of the sink issue is meritless.

Nor are we persuaded by Waln's suggestion that defense counsel was ineffective for failing to call Jackson as a witness at trial. Waln contends Jackson's testimony was critical because it "established physical impossibility, a qualitative distinction from the trial testimony, which merely suggested the sink likely was not functional." In making this argument, Waln completely overlooks Mayes's testimony that there was no sink in Waln's classroom. Indeed, it is physically impossible to wash one's hands in a sink that does not exist.

We also agree with the Attorney General that Jackson's affidavit is not wholly favorable to the defense. The prosecutor presented evidence at trial showing there were portable sinks at the school in 2023. However, aside from Alexis's testimony, the prosecutor did not present any evidence showing those sinks were at the school in 2019. Defense counsel, in contrast, presented evidence that the school did not order portable sinks until 2020, which suggests there were no portable sinks on the school's campus before then. Jackson's affidavit would have undercut that evidence—and supported the prosecutor's case— by confirming there were portable sinks at the school "long before the Covid break." Although Jackson asserted those sinks were "never" operational or filled with water, it is doubtful he had personal knowledge of the operational state of every sink at all times.

On this record, Waln has not shown counsel's performance was deficient or that he suffered any prejudice from it. (See *Hoyt,*

*supra*, 8 Cal.5th at p. 958.)  Accordingly, the trial court properly denied his motion for a new trial on this ground.

### 3.    *Cumulative error does not require reversal*

Waln argues the trial court abused its discretion in denying his motion for a new trial because of cumulative error. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  We are satisfied that Waln received a trial that was fair and comported with due process.[16]

---

[16]    For the first time in his reply brief, Waln argues the trial court should have granted his motion for a new trial based on newly discovered evidence.  Waln forfeited these issues by failing to raise them in his opening brief on appeal.  Accordingly, we do not consider them.  (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [declining to consider argument raised for first time in appellant's reply brief].)

**DISPOSITION**

We affirm the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                  EGERTON, Acting P. J.

We concur:



ADAMS, J.



HANASONO, J.